IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| WAYNE D. PERRY, | : | |
| Plaintiff, | : | |
| vs. | : | CIVIL ACTION 09-00001-CB-C |
| GRANTT CULLIVER, et al., | : | |
| Defendants. | : | |

### REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding pro se and in forma pauperis filed a Complaint under 42 U.S.C. § 1983.  This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the Court on Defendants' Motions for Summary Judgment (Docs. 30, 31, 35, 36, 51, 52), and Plaintiff's Oppositions thereto.  (Docs. 34, 39, 40, 46, 47, 48, 57).  For the reasons stated below, it is recommended that Defendants' Motions for Summary Judgment be granted and that Plaintiff's action be dismissed with prejudice.  In light of this recommendation, Plaintiff's Motion to Amend Complaint (Doc. 9), Motion for Discovery (Doc. 28), Motion to Amend Complaint (Doc. 38), Motion to Produce Documents (Doc. 44), Motion for Hearing (Doc. 45), Motion for Discovery (Doc. 49), Motion for Leave to File Reply (Doc. 53), Motion to Amend/Correct Complaint (Doc. 56) and Motion for Hearing (Doc. 58) are each hereby **DENIED** as moot.

## I.  SUMMARY OF ALLEGATIONS

1. Plaintiff, an inmate at Holman Correctional Facility ("Holman"), alleges that he has been denied proper medical treatment for the condition of "crabs," also known as pubic lice, since 2004.  (Doc. 1 at 4, 6, Complaint).  Plaintiff claims that "crabs" have now crawled inside his rectum, causing "flies" to swarm around him, and that he is unable to sit "in a certain fashion."  (Doc. 47 at 6).  Further, Plaintiff contends that a dark spot is forming at his neck, and beginning to spread over his body, as a direct result of the "crabs" in his rectum.  (Doc. 26, Letter from Plaintiff).

2.  From its review of the record, the Court notes the following specific allegations made by Plaintiff in this action:

.....

> "2.  In December 2003 or January 2004 Plaintiff experienced something crawling on him around his private area.  He sought treatment from healthcare nurse Lisa Nabb who did a full examine (sic) of my private area with a magnifying glass and confirmed I was in fact infested with crabs.  Nabb gave me a plastic cup of crab shampoo.  After proper use of the shampoo, the shampoo '**did not**' kill the crabs and I sought treatment again.
>
> "3.  I attempted over and over to receive care and treatment from February 2004 to March 2005.  I was informed by health care nurse Bridget Wilson in March 2004 that 4 other inmates at Fountain Prison complained about the same problem, that its just in my mind, and that I just think I got crabs.  After filing (3) complaints: (BW008 Feb. 26; BW011 March 1; and BW010 March 10, 2004), Dr. Barnes failed to take an adequate history of the Plaintiff's complaints when he gave consent to be treated by signing the sick call request forms.  I was informed by Nurse Wilson in March 2005 that its only in your mind, and thats (sic) all it is.

2

"4. As a result of the continued representations to Plaintiff that its (sic) only in your mind; you just think you got crabs and 4 other inmates are complaining - - Plaintiff directed the problem to the Warden Grantt Culliver and retired Healthcare Supervisor Charlene Gandy in order to comply with the grievance procedures.

"5. In June 2005, I filed (2) two complaints and two inmate medical grievances to Culliver and Gandy. They 'did not' return a copy of the grievance form to me, but instead they sent for me to come up front to the administration building. In the grievance forms I stated:

> 'I felt crabs crawling on me. I signed up for sick call (on each of 4 or 5 visits) healthcare refused to treat me (sic). The problem went untreated, as a result, the crabs have spread to the inside of my rectum.'

"A few days later, Officer COI McCant informed me Culliver wanted me in his office. McCant escorted me up front. When we got there Culliver and Gandy was there waiting. Culliver had the grievance and complaint in his hands and stated: 'What is this?' I said: 'I feel crabs crawling on me.' Culliver said: 'You keep this up I am (sic) going to order you a shot.' I responded, 'Man, I feel got (sic) d___ crabs crawling on me - - I know if somethings crawling on me or not.' Culliver stated: 'If you - - just keep it up I'm going to order you a shot (sic).' Culliver got on the phone and ordered Gandy and McCant to '<u>take him to the hospital</u>.'

"6. Gandy, McCant and I went to the hospital. When we got there Dr. Benjamin and Lt. Brown was there waiting. I told Benjamin: 'Listen man, I had crabs. Nurse Nabb gave me crab shampoo. The shampoo didn't work, y'all refuse to treat me, I feel crabs crawling in my rectum!' Dr. Benjamin stated: 'You sure you're not hallucinating in the mind you got crabs?' I asked Benjamin: 'If you had something crawling on you would you know it?' Benjamin stated 'Yes!' He looked and said, 'I don't see nothing.' I said: 'Man, the crabs crawled in my rectum!' Dr. Benjamin said: 'You sure you're not hallucinating you got crabs?' I stated: 'The crabs spread

3

> inside my rectum!'
>
> .....
>
> "I have been neglected treatment for crabs so long now until I had to confine myself to a one man cell because 'flies' started swarming around me!!!!!! ... This problem that has been forced upon me is causing me to be unable to sit in a certain fashion, that has resulted in discomfort, suffering and putting my health at grave risk."

(Doc. 47 at 1-6, Affidavit of Plaintiff).

    3. Plaintiff's medical records reflect that he first complained that he felt "crabs crawling" on him on February 26, 2004, but refused to be seen at sick call on that date. (Doc. 30, Ex. 2 at 14, Medical Records).

    4. Plaintiff next reported for sick call on February 29, 2004, but did not complain of itching or crabs. (Id. at 15). Plaintiff next complained of an unidentified "personal problem" on March 1, 2004, but again refused sick call. (Id. at 17).

    5. On March 10, 2004, Plaintiff complained of feeling "something crawling" and "biting" him. (Id. at 16). "[N]o visible rash, bumps, unable to detect crabs" was written on his medical record. (Id.). It was also noted on the health record that Plaintiff "refuses to see doctor, has own cure." (Id.).

    6. Plaintiff next reported for sick call on September 15, 2004, for treatment of burns he received after applying oven cleaner to his scrotum. (Id. at 18).

    7. The records reflect the next sick call request made by Plaintiff to have been on March 7, 2005, at which time he complained that "[t]his is my third request to get shampoo for crabs" and warned that legal action would be taken if he was not treated for

4

his problem. (Id. at 19). It was noted that Plaintiff wanted only to see a doctor, and did not want to be screened again by a nurse. Plaintiff was referred to see Dr. Delano Benjamin. (Id. at 19).

8. Again, on March 11, 2005, Plaintiff noted on the sick call request form "Fourth Time I need Treatment for Crabs!" (Id. at 20). Plaintiff's medical record reflects that he was examined and "[n]o signs of infestation. No visible rash or signs of scratching." (Id.). This is the last record of a sick call request made by Plaintiff regarding his complaint of crabs, although his health records do reflect other subsequent sick call requests regarding other various ailments. (Id. at 21-25).

9. Defendant Dr. Delano Benjamin has averred that he treated Plaintiff following Plaintiff's "chemical burn to his scrotum when he applied 'oven cleaner' to his scrotum" and "also examined him on several occasions regarding his complaints of 'crabs' and never found any evidence of any parasitic organism." (Doc. 30, Ex. 1 at 2, Affidavit of Dr. Delano Benjamin).

10. Dr. Benjamin also has averred that during his examinations of Plaintiff, he "never identified any pubic lice or nits on his body...[and] never saw any physical manifestations of the presence of pubic lice, such as skin rashes, lesions or sores." (Id. at 3). "Mr. Perry never exhibited any signs of infection resulting from a pubic lice infestation that required any treatment of any kind." (Id.).

11. Plaintiff's medical records reflect that he refused rectal exams in May of 2008 and 2009. (Doc. 30, Ex. 2 at 35-36).

5

12. Plaintiff's medical records also indicate that in April and July of 2009, he was evaluated by various mental health staff who concluded that Plaintiff was suffering from "paranoid delusions," noting in particular Plaintiff's belief that "crabs travel from rectum, exit from rash on neck." (Id. at 37-39).

13. In August 2009, Plaintiff "underwent an ova and parasite study (BW048), which would have revealed the presence of pubic lice if such parasites were present." (Doc. 30, Ex. 1 at 3, Ex. 2 at 54). According to Dr. Benjamin, the "study was clearly negative." (Id.).

## II.  PROCEDURAL ASPECTS OF THE CASE

1. On January 5, 2009, Plaintiff filed the present § 1983 action against Defendants Warden Grantt Culliver, Charlene Gandy, Dr. Delano Benjamin, Nurse Bridget Wilson and Health Care Unit[1] alleging denial of proper medical treatment for his condition of

---

[1]Plaintiff also names "Health Care Unit" as a Defendant in this action. The Court assumes Plaintiff is referring to either Prison Health Services ("PHS") or Correctional Medical Services ("CMS"), private companies which have at different times contracted with the Alabama Department of Corrections to provide medical care in its facilities. (Doc. 36, Ex. 3 at 3, Affidavit of Warden Grantt Culliver). However, in order to bring a viable § 1983 claim, the defendant sued must be an entity that is subject to being sued. Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir.1992). The capacity of a party to be sued is "determined by the law of the state in which the district court is held...." Fed. R. Civ. P. 17(b); see Dean, 951 F.2d at 1214. "Health Care Unit," PHS, or CMS is not a distinct legal entity that is subject to suit, nor is it a "person" for § 1983 purposes. Wood v. Prison Health Services, Inc., 2008 WL 205314, *7 (S.D. Ala. Jan. 22, 2008). PHS or CMS, as private corporations, are liable under § 1983 only when an official policy or custom of the corporation causes the alleged constitutional deprivation. Id. As Plaintiff makes no "policy" allegations, he would have no claim against either PHS or CMS or, as Plaintiff states, "Health Care Unit." Moreover, Plaintiff has failed to show a constitutional violation in this action.

pubic lice or "crabs." (Doc. 1 at 3-4, 6-10).

2. Plaintiff claims that his medical treatment was inadequate, causing him "humiliation, pain and suffering," for which he seeks damages in the amount of 2.08 million dollars, as well as an award of attorney's fees. (Id. at 5, 7 ).

3. In their Answers and Special Reports filed on September 8, 2009, September 11, 2009, November 18, 2009, and November 19, 2009, Defendants deny Plaintiff's allegations and assert numerous defenses including absolute and qualified immunity.[2]

---

[2] In his Complaint, Plaintiff does not specify whether he is suing Defendants in their official or individual capacities or both. Thus, the Court will consider both. As a state official, Defendant Warden Culliver is absolutely immune from suit *for damages* in his official capacity. See Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998) (state officials sued in their official capacities are protected from suit for damages under the Eleventh Amendment).

Further, "[q]ualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). Until recently, the Court followed the mandatory procedure of Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part, Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009), which required the Court to determine whether the plaintiff's allegations, if true, established a constitutional violation and, if the first step was satisfied, to determine whether the right at issue was clearly established at the time of the alleged misconduct. While that procedure is now discretionary, as opposed to mandatory, see Pearson, id., the Court finds it beneficial in this case. Having found herein that Plaintiff's evidence does not establish a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

Although Defendants Dr. Benjamin, Nurse Wilson, and Charlene Gandy have asserted the affirmative defenses of qualified and absolute immunity, as private entities, Defendants are not entitled to either immunity defense. See Swann v. Southern Health Partners, Inc., 388 F.3d 834, 837 (11th Cir. 2004) ("The parties agree that as a private entity, SHP [a private corporation employed by the County to provide medical care to

7

(Docs. 30, 31, 35, 36, 51, 52).

    4. On September 15, 2009, the Court ordered that the Special Reports and Answers of Defendants Dr. Benjamin, Nurse Wilson, and Warden Culliver be treated as Motions for Summary Judgment.  (Doc. 37).  On December 9, 2009, the Court ordered that Defendant Charlene Gandy's Special Report and Answer be treated as a Motion for Summary Judgment as well.  (Doc. 55).  Defendants' motions and Plaintiff's responses in opposition thereto are now before the Court.

### III.  SUMMARY JUDGMENT STANDARD

    1. In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles.  The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment.  "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . .'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c).

    2. The Court must view the evidence produced by "the nonmoving party, and all

---

inmates at the county jail] is not entitled to assert a qualified immunity defense."); Hinson v. Edmond, 205 F.3d 1264, 1265 (11th Cir. 2000) (a "privately employed prison physician" "is ineligible to advance the defense of qualified immunity"); Edwards v. Alabama Dep't of Corrections, 81 F. Supp. 2d 1242, 1254 (M.D. Ala. 2000) (a private entity contracting with a state to provide medical services to state inmates "is not entitled to qualified immunity....").  With respect to absolute immunity, Defendants have cited no case, and the Court is aware of no case, extending absolute immunity to privately employed physicians or other medical professionals providing medical services to state inmates.

factual inferences arising from it, in the light most favorable to" that party. Barfield v. Brierton, 883 F.2d 923, 934 (11th Cir. 1989).

    3. However, Rule 56(e) states that:

> an adverse party [to a motion for summary judgment] may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e); see also Celotex Corp., 477 U.S. at 325-27.

    4. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted). "Summary judgment is mandated where a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007) (citations omitted).

## IV. DISCUSSION

    1. As discussed above, Plaintiff seeks redress in this action pursuant to 42 U.S.C. § 1983 for an alleged constitutional deprivation arising out of his medical treatment beginning in 2004, while he was incarcerated at Holman Correctional Facility. (Docs. 1, 2).

2. Plaintiff claims that Defendants provided unconstitutionally inadequate medical treatment for him beginning in 2004, when he allegedly developed the condition of pubic lice, or "crabs."  (Docs. 1, 2).

3. Section 1983 provides in pertinent part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 (1994).

4. In addressing Plaintiff's claims brought under § 1983, the Court begins its analysis "by identifying the specific constitutional right allegedly infringed. . . ."  Graham v. Connor, 490 U.S. 386, 394 (1989).

5. The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

6. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs."  Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

7. In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as

follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

Sims, 25 F.3d at 983.

8. To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the objective existence of a "serious" medical need. Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (1994) (citing Hudson v. McMillian, 503 U.S. 1, 10 (1992)). "[A] 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill, 40 F.3d at 1187 (citations omitted). "[T]he medical need must be 'one that, if left unattended, pos[es] a substantial risk of serious harm.'" Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quotation marks and citations omitted).

9. Next, in order to meet the required subjective element of an Eighth Amendment denial of medical care claim, a plaintiff must demonstrate "deliberate indifference" to a serious medical need. Hill, 40 F.3d at 1186.

> In Estelle, the Supreme Court established that "deliberate indifference" entails more than mere negligence. Estelle, 429 U.S. at 106, 97 S. Ct. 285; Farmer, 511 U.S. at 835, 114 S. Ct. 1970. The Supreme Court clarified the "deliberate indifference" standard in Farmer by holding that a prison official cannot be found deliberately indifferent under the

> Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting Farmer and Estelle, this Court explained in McElligott that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott, 182 F.3d at 1255; Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

Farrow, 320 F.3d at 1245-46 (emphasis in original).

10. "Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." Hill, 40 F.3d at 1187 (internal citations and quotation marks omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." Id.

11. "The tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." Hill, 40 F.3d at 1188 (emphasis in original) (quoting Harris v. Coweta County, 21 F.3d 388, 393-94 (11th Cir. 1994)).

> 12. The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. Gaudreault, 923 F.2d at 208; Monmouth County, 834 F.2d at 347. Where the delay results in an inmate's suffering "a life-

12

> long handicap or permanent loss, the medical need is
> considered serious." Id.

Hill, 40 F.3d at 1188 (emphasis in original).

13. "An inmate who complains that delay in medical treatment rose to a constitutional violation must place **verifying medical evidence** in the record to establish the detrimental effect of delay in medical treatment to succeed." Id. (emphasis added) (footnotes omitted).

14. Having reviewed Plaintiff's medical records at length, the Court finds nothing in Plaintiff's records to indicate that he has actually suffered from pubic lice as he alleges. Therefore, Plaintiff has failed to establish the existence of a "serious medical need" and, thus, cannot satisfy the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment. See Hill, 40 F.3d at 1186 (citing Hudson v. McMillian, 503 U.S. 1, 10 (1992)).

15. However, even if Plaintiff had shown that he had suffered from the condition of pubic lice, and assuming for purposes of this motion that such condition constitutes a serious medical need, Plaintiff has failed to show that Defendants were deliberately indifferent to Plaintiff's serious medical need.

16. Plaintiff claims that he first complained of, and was treated for, "crabs" in 2004, by Nurse Lisa Nabb. According to Plaintiff, in response to his complaint, Ms. Nabb gave him medicated shampoo for his condition, but that the shampoo did not kill

the "crabs."[3]  (Doc. 2 at 1).

17. Plaintiff's medical records indicate that he first complained of pubic lice on February 26, 2004, on which occasion he refused sick call.  (Doc. 30, Ex. 2 at 14). Plaintiff again requested "crab shampoo!" on a sick call request dated March 10, 2004. (Id. at 16).  Upon examination, there was no detection of "crabs" and no rash or bumps. (Id.).

18. On September 15, 2004, Plaintiff sought treatment after applying oven cleaner to his groin area "to stop the itching."  (Id. at 18).  At that time, Plaintiff was treated for second degree chemical burns as a result of the application of oven cleaner to his skin. (Id. at 27; Doc. 30, Ex. 1 at 2).

19. On March 7, 2005, and March 11, 2005, Plaintiff again requested shampoo and treatment for "crabs."  (Doc. 30, Ex. 2 at 19, 20).  It was noted on March 11, 2005, that there were "no signs of infestation," and "no visible rash or signs of scratching."  (Id. at 20).

20.  The next reference to "itching" found in Plaintiff's medical records is in an ADOC Health Evaluation in May of 2008, where a notation of "itching all the time" was written in the "other" category, among a list of possible illnesses.[4]  (Id. at 10).

---

[3]Plaintiff suspects that the shampoo may have "only killed the female crabs and not the male crabs."  (Doc. 47 at 6).

[4]It is noted that Plaintiff filed a lawsuit against Shirley Johnson, Charlene Gandy, Grantt Culliver, and Delano Benjamin in this Court on April 8, 2008, asserting allegations virtually identical to those made in this action.  (Perry v. Gandy, et al., 08-185-WS-B,

21. On April 19, 2009, Plaintiff complained of a large spot on his neck "because healthcare would not provide [him] treatment for crabs where the crabs crawled inside [his] rectum (sic)."  (Id. at 45).  The records reflect that Plaintiff then began filing medical grievances regarding his belief that he had untreated "crabs" which had crawled into his rectum and were causing a spot to appear on his neck.  (Id. at 43, 44, 47, 49, 50, 52, 53).

22. On April 21, 2009, Dr. Barnes administered to Plaintiff a rectal and total body exam to look for parasites.  (Id. at 11).  On August 7, 2009, an ova and parasite study was was conducted to test Plaintiff's stool for any evidence of parasites.  (Id. at 54).  According to Dr. Benjamin, this study "would have revealed the presence of pubic lice if such parasites were present."  (Doc. 30, Ex. 1 at 3).  The study, avers Dr. Benjamin, was "clearly negative."  (Id.).

23. Defendant Dr. Delano Benjamin has averred that he examined Plaintiff on various occasions regarding Plaintiff's complaints of "crabs," but "never found any evidence of any parasitic organism."  (Doc. 30, Ex. 1 at 2).

24. Defendant Nurse Bridget Wilson stated in her affidavit that she "examined Mr. Perry on three (3) separate occasions...March 10, 2004, March 8, 2005, and March 11, 2005."  (Doc. 30, Ex. 2 at 5).  Nurse Wilson avers that these examinations occurred during sick call clinics, and that never did Plaintiff "demonstrate any visual signs of 'pthirus pubis' or crabs," nor did he "exhibit any symptoms of any parasitic infestation or

---

Doc. 1).  This action was dismissed for Plaintiff's failure to comply with this Court's order.  (Id., Docs. 6, 7).

infection." (Id.). According to Nurse Wilson, "[a] visual examination of Mr. Perry did not reveal any signs or confirmation of the presence of parasites." Despite the lack of visual signs, Nurse Wilson states that she did refer Plaintiff to see Dr. Benjamin because of the nature of his complaints. (Id.).

25. According to Dr. Benjamin, "[d]espite numerous examinations by numerous medical professionals, no evidence of pubic lice has been found." (Doc. 30, Ex. 1 at 3).

26. On April 28, 2009, Plaintiff was evaluated by the prison mental health staff who noted that he was anxious and obsessed about having "crabs." (Doc. 30, Ex. 2 at 39). Among the behavioral observations noted was "paranoia." (Id.). Plaintiff was also evaluated in July of 2009, by Dr. Earnshaw with Holman's mental health services, who concluded that Plaintiff was suffering from "persecutory paranoid delusions" and "somatic delusions," noting in particular Plaintiff's belief that "crabs travel from rectum, exit from rash on neck." (Doc. 30, Ex. 2 at 37-38).

27. In this action, Plaintiff complains extensively of the "deliberate indifference" with which Defendants acted and of the denial of appropriate medical treatment which, according to Plaintiff, has contributed to his ongoing injuries.

28. In order to constitute "deliberate indifference," Defendants must have known of and disregarded an excessive risk to Plaintiff's health. Farrow, 320 F.3d at 1245.

29. The record is devoid of any evidence that Defendants had subjective knowledge of, and disregarded, a risk of serious harm to Plaintiff from a pubic lice

condition, or any other condition for that matter. To the contrary, the record shows that the medical staff at Holman appropriately responded to Plaintiff for his complaints of "crabs," despite there being absolutely no evidence that such a condition ever existed. (Doc. 30, Ex. 2). The record also reflects numerous responses from Warden Culliver to Plaintiff's grievances, indicating that Warden Culliver was actively attempting to help resolve Plaintiff's complaints. (Id.). Despite the lack of evidence of the existence of the condition, Plaintiff was still afforded numerous examinations and medical tests to confirm for him the absence of pubic lice. (Id.).

30. A review of Plaintiff's medical records submitted to this Court reveals quite extensive medical care by Dr. Benjamin and the staff of the Health Care Unit. (Id.). Although it might not have been the specific medical care that Plaintiff wanted, there is certainly no evidence that Warden Culliver, Dr. Benjamin, the nurses or any of the staff of the Health Care Unit were deliberately indifferent to Plaintiff, or that they ever stopped responding to Plaintiff's complaints or stopped trying to improve his condition. In fact, Plaintiff's own words acknowledge that he was receiving medical care. In a letter to this Court dated August 17, 2009, Plaintiff complains that

> [t]he new doctor have acted carelessly and dishonestly to my serious medical problem (sic). My cry is that I am suffering with crabs inside my rectum and the doctor ordered selenium sulfide. The last doctor ordered cream! The doctors have been grossly wrong about the seriousness of my medical need.

(Doc. 26 at 1).

  31. "When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1035 (11th Cir. 1989). "[D]elay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." <u>Hill</u>, 40 F.3d at 1189.

<u>Martin v. Barnes</u>, 2008 WL 250603, *8 (S.D. Ala. Jan. 29, 2008).[5]

 32. Further, Plaintiff has submitted no "verifying medical evidence" showing that any delay in treatment by Defendants worsened or exacerbated his medical condition. <u>Hill</u>, 40 F.3d at 1188 (emphasis added).

 33. Considering all of the circumstances surrounding the treatment that Plaintiff received for his complaints, the Court cannot at all say that the Defendants were deliberately indifferent to Plaintiff's alleged medical problem. Thus, Plaintiff has failed to establish the subjective element of his denial of medical care claim. Further, Plaintiff's statement that as a result of his medical complaints, Warden Culliver threatened him with "antipsychotic drugs" is nothing more than a baseless, conclusory, self-serving statement entirely inconsistent with the record in this action.

 34. If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof

---

[5]"Pursuant to Eleventh Circuit Rule 36-2, unpublished opinions are not considered binding precedent, but may be cited as persuasive authority." <u>Lanier Constr., Inc. v. Carbone Props. of Mobile, LLC</u>, 253 Fed. Appx. 861, 865, 2007 WL 3307384, *3 (11th Cir. 2007).

at trial," Rule 56(c) mandates that summary judgment be entered against the nonmovant. Celotex Corp., 477 U.S. at 322.

35. "No material issues can be in dispute where the plaintiff's evidence fails to establish a constitutional violation." Bennett v. Parker, 898 F.2d 1530, 1534 (11th Cir. 1990). Therefore, since no constitutional violation has been established, Defendants' Motions for Summary Judgment is due to be granted.

## V.  CONCLUSION

Based on the foregoing, the Court concludes that Defendants are entitled to summary judgment in their favor on all claims asserted against them by Plaintiff.

Accordingly, it is recommended that the Motions for Summary Judgment of Defendants Dr. Delano Benjamin, Nurse Bridget Wilson, Charlene Gandy, and Warden Grantt Culliver be GRANTED and that the entirety of Plaintiff's Complaint against all Defendants be DISMISSED with prejudice.

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this 11th day of March, 2010.

   s/WILLIAM E. CASSADY            
  **UNITED STATES MAGISTRATE JUDGE**

# MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

l.      *Objection*.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982) (*en banc*).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days[6] after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      *Transcript (applicable Where Proceedings Tape Recorded)*.  Pursuant to 28 U.S.C. § 1915 and FED. R. CIV. P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

---

[6] Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]" Fed. R. Civ. P. 72(b)(2).